EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 09 CR 332-4 |
| v. | ) | |
| | ) | Judge Joan B. Gottschall |
| JORGE URIARTE, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT JORGE URIARTE'S SENTENCING MEMORANDUM**

NOW COMES defendant Jorge Uriarte, by his attorney John M. Beal, and

for his Sentencing Memorandum states as follows:

## I. INTRODUCTION

1.    During the prior sentencing hearing, this Court stated, "I don't think there

is, unfortunately, much in Mr. Uriarte's background that gives me great

hope for Mr. Uriarte's future." This memorandum provides the Court with

substantial new information that demonstrates that Jorge actually has a

good prospect for a productive and responsible life after release from

incarceration. Jorge did have a difficult childhood. But at the time of the

events of this case he was developing legitimate job skills and employment

experience that he will be able to build on after release from incarceration.

In addition, he has always been devoted to his family.

2.    Second, the Court of Appeals in its opinion in this case ruled that this

Court has full discretion to consider to sentences imposed on the other



conspirators in this case (which goes beyond only the other actual co-defendants) in determining whether there are unwarranted disparities. *United States v. Cardena,* 842 F.3d 959, 999-1000 (7th Cir. 2016).

3. Finally, it will be shown that the sentence that was initially imposed on Jorge, 720 months incarceration, is far in excess of that which is supported by §3553(a) and the legitimate purposes of sentencing.

## II. SUPPLEMENTAL FACTS FOR SENTENCING

4. At the time of the initial sentencing, counsel was not able to provide the court with a sufficient explanation of why Jorge actually has a good prospect of becoming a responsible and productive member of society upon release from the Bureau of Prisons. However, Jorge is now fully cooperating with defense counsel and other sources of information have also been located. The following information comes from the Presentence Report and two Social Investigation Reports (SIRs) prepared by the Circuit Court of Cook County, Juvenile Division, in 1995 and 1996. The Presentence Report contains information from the first SIR but not the second. Counsel was permitted to review and make notes from, but not copy, both reports. Finally, additional documents relating to Jorge were obtained and are referred to and attached as exhibits.

5. As the Presentence Report relates at page 43, Jorge was born and raised in Chicago until he was 12. Jorge's mother and his father, Manuel Uriarte,

separated when Jorge was two years old. His mother then co-habited with Raul Hernandez, who was physically abusive to both Jorge and his mother. His mother separated from Mr. Hernandez when Jorge was ten. By the time Jorge was 15, Mr. Hernandez was in federal prison for drug dealing.

6.    When Jorge was 13 he moved to California where he initially lived with an aunt. Then his mother and brothers arrived. However, a year later, when his mother and brothers moved back to Chicago, Jorge was left in Mexico with his father for just under a year. His Spanish language skills were limited, so he had a difficult time at school and in the community. To this day Jorge does not know why he was left, or more accurately stated, abandoned, in Mexico. As he understands it, it was his aunt in California who finally prevailed upon his mother to allow him to return to the family in Chicago.

7.    Upon returning to Chicago, Jorge repeated 8th grade because of his having been in school in Mexico. At this time he joined the City Knights street gang, in part because his brothers Hector and Manuel had joined while he was in Mexico and because other friends had joined. It may have been a practical necessity because the SIR states that Jorge's neighborhood (the Back of the Yards) was gang ridden. Jorge did not do well in 9th grade at Kelly High School. According to the 1996 SIR Jorge then spent substantial time during the next year attending school at the Cook County Juvenile

Detention Center. The SIR report states that he was there because he had five juvenile court referrals, but it should be noted that they resulted in no findings of delinquency. The 1996 SIR, written in July 1996, states, "This P.O. spoke to Jorge's teacher in the detention center last week and she gave a very positive report on Jorge. She commented that his behavior was very good, especially after the first day when he had a couple of problems with this initial adjustment and that recently she gave him a test of general knowledge and out of a total of sixty-two questions he answered fifty five correctly." The Presentence Report section on education (PSR, p. 48) is based on the 1995 SIR and its discussion of Jorge's more problematic behavior while he was repeating 8th grade at Hamlin elementary school. The Presentence Report relates problems that Jorge had at Hamlin. But the PSR acknowledges that even then, "It is noted that several faculty members told the interviewing probation officer that the defendant's behavior improved somewhat approximately two to four weeks prior to his juvenile incarceration." The SIR specifically states that his home room teacher, Mrs. Harris, stated that "approximately four weeks before Jorge had gotten locked up he had changed for the better. She stated that she saw that he was making more of an effort in listening in her class." This should be seen in combination with the later report of Jorge's good performance from the juvenile detention center teacher.

4

8.   The next significant life events for Jorge are Hector and Jorge separately

being shot.  According to the Presentence Report (PSR, p. 47), and the SIR,

Jorge saw Hector being shot.  Hector spent 18 days in the hospital and had

reconstructive surgery and had a metal plate put in his head.  This event

affected Jorge and his entire family. (PSR, p.47).   Jorge was angry because

nothing happened to the shooter.  The PSR reports that Jorge's mother

"began taking Prozac for 'nerves' after witnesses the shooting of Hector

Uriarte." (PSR lines 1270-1271). A few months later, Jorge was shot in the

back.  According to the SIR, it happened when Jorge's mother had sent him

to an Omni store.   The SIR states that the Saints street gang was

responsible for both shootings.

9.   Jorge has one serious conviction prior to this case, a conviction for shooting

a member of the Saints gang, the ones who had shot both Jorge and Hector.

This offense occurred when Jorge was 16.  He pleaded guilty to attempted

murder and was sentenced to six years incarceration.  He was released from

the Illinois Department of Corrections on August 24, 2001. (PSR, p. 33),

after serving a total of approximately three years and six months.   This is

where Jorge's dual narrative begins.   Three months after being released

from the Illinois Department of Corrections he began dating Michelle Roti.

They were married in 2006.  They have three children and Jorge adopted a

fourth child of Michelle's from a prior relationship.   Jorge was extremely

active in his children's lives. He participated in family and school activities. He went on school field trips and Jorge remembers helping with a class Halloween party. The family also went on trips, such as to Disney World and to the Wisconsin Dells. There were also regular cookouts with the extended Uriarte family. See family photos at Exhibit One. Jorge also for many years was a coach of the Oak Forest Blue Demons Little League baseball team, which played in the Oak Forest Baseball Association, a major Little League franchise. See baseball team photo at Exhibit Two.

10. At the same time, Jorge was developing the ability and experience to support his family through legitimate employment. While in the immediate aftermath of his release from prison his employment was not highly structured, by 2007 to 2009, the period immediately preceding Jorge's arrest in this case, Jorge had acquired real job skills and experience. His work primarily involved setting up trade shows at McCormick Place, Navy Pier, the Stephens Center and similar locations. He also worked on trade shows in Las Vegas on occasion.

11. The following employment records have been obtained. For 2001 (Jorge was released from IDOC on August 24, 2001), a tax return and W-2 show $4,750 in wages from Norton Sons Roofing Co. And a 2002 tax return and W-2 show $5,073 in wages from the same company. See Exhibit Three. The next available records are for 2007. In that year Jorge became a

member in good standing of the Carpenters Local Union No. 80 of the
United Brotherhood of Carpenters and Joiners of America. He maintained
his membership through his arrest in this case, which was on April 10,
2009. See Exhibit Four. In 2007, Jorge's tax return shows that he earned
$23,947 and was employed by, and received W-2 Forms from, Will Work,
Inc., Teamwork Labor Services, Employco Services, and Union Payroll
Agency, Inc. See Exhibit Five. In 2008, Jorge earned $50,705 and received
W-2 Forms from Will Work, Inc., Teamwork Labor Services, Inc., McKernin
Design and Development, Employco Services, Creative Management
Services, Balz, Inc., and Stevens Exhibits/Displays, Inc. In addition he
received $7,840 in unemployment compensation because of the seasonal
nature of the trade show work. See Exhibit Six. In 2009, before his arrest
in April, Jorge worked for, and received W-2 Forms from, McKernin Design
& Development, Balz Banquet and Reception Halls, and Illinois
unemployment compensation, all totaling $11,858. See Exhibit Seven.
Letters from two employers shows that he was a valued employee. See
Exhibit Eight.

12.    Jorge relates that after he and Michelle moved to Oak Forest in 2005, and
particularly as he became involved with other parents in Little League, he
became aware of and involved in an entirely different world from the violent
and gang infested Back of the Yards neighborhood in which he had grown

up. He went to White Sox games with other Little League fathers. His legitimate employment was growing. He had never experienced anything like this in his entire life. He now wishes he had grown up in this world. But he had already and simultaneously become enmeshed with Saul Rodriguez.

13.     At the same time as Jorge was moving into a normal world, the present case was taking place. Most of the defendants in this case came from the same neighborhood in Chicago, the Back of the Yards. Saul Rodriguez was from that neighborhood, even though he later moved elsewhere. Most important is to look at the timing of the individual criminal acts, all of which were planned and orchestrated by Saul Rodriguez. Attached as Exhibit Nine is a list of the criminal acts attributed to Jorge. Two were in 2002, two were in 2003, two were in 2004, none were in 2005, four were in 2006, one was in 2007, two were in 2008, and one was in April, 2009. Thus, the activities of the "Rodriguez crew," as the government calls them in its version of the offense, was very much a part time activity for the members. At the same time, Jorge was preparing himself for life after the Rodriguez crew. He engaged in lawful, productive work as a union carpenter. In addition, there is no evidence that Jorge initiated, planned or was otherwise in charge of any of the criminal activities.

14.     Whatever period of incarceration he faces will have the requisite deterrent

effect on Jorge. Upon release from incarceration he will be on supervised release. But, quite apart from that, Jorge fully intends to return to the world he was entering in the 2007-2009 period. He has no intention of ever returning to prison.

15. Two Bureau of Prisons matters remain. First, the Supplemental Presentence Report at pages 2-3 lists the educational programs that Jorge has taken while he has been in the Bureau of Prisons. Attached as Exhibit Ten is a more recent, longer list of programs Jorge has completed. This demonstrates Jorge's determination to better himself even while incarcerated.

16. Second, the Supplemental Report at page two lists three disciplinary incidents for possession of narcotics in 2016 while at USP Lewisburg. Jorge has been vigorously contesting all three of these since they happened. The BOP has been uncooperative with counsel in providing copies of the records for the incidents and the paperwork for the appeals that Jorge has taken. Hopefully by the time of the sentencing hearing the defense will be in a position to refute these incidents.

17. Finally, letters in support from family members are attached as Exhibit Eleven.

## III. LEGAL ISSUES

18. The Supplemental Presentence Report correctly states at page 3, Sentencing

Options, that consequent to the Court of Appeals decision in this case, the mandatory minimum sentence for Count Eight is five years.

19.     Defendant Uriarte also persists in two objections to the sentence. One is an objection to Count Eleven being a consecutive 25 year sentence, on the grounds that the 25 year add-on was not charged in the indictment nor found by the jury. Defendant submits that *Almendarez-Torres v. United States*, 523 U.S. 224, 244-47 (1998) is wrongly decided. It is recognized that this argument is foreclosed by circuit precedent, including the Court of Appeals decision in this case. But, as the defendant has done in such cases as *United States v. Fox*, 878 F.3d 574, 579 (7th Cir. 2017), Jorge seeks to preserve this issue for Supreme Court review. Secondly, defendant Uriarte has asked counsel to object to the conclusion of this Court and the Seventh Circuit that any of the sections of the Illinois kidnapping statute, 720 ILCS 5/10-1(a), as that statute has been interpreted by the Illinois courts, constitute a crime of violence for purposes of 18 U.S.C. §924(c), under *Johnson v. United States*, 1235 S.Ct. 2551 (2015). Jorge seeks to preserve this issue for presentation in a petition under 28 U.S.C. §2255 and for Supreme Court review.

20.     Jorge also brings to the Court's attention that since the original sentencing in this case, the Supreme Court ruled in *Dean v. United States*, 137 S.Ct. 1170, 1178 (2017), that in imposing sentence in this case the Court may

take into account the fact that the three mandatory minimum sentences will be imposed, when the Court decides on the additional guideline sentence. Circuit precedent discouraged such consideration before *Dean*.

## IV. SECTION 3553(a) FACTORS

21. Title 18 U.S.C. §3553(a) requires that the Court impose a sentence that is sufficient, but not greater than necessary, to comply with the purposes of the statute. But it must first be recognized that not all §3553(a) factors are created equal. Only the §3553(a)(2) factors have the statutory requirement that the sentence be sufficient, but not greater than necessary, to accomplish them. The portions of §3553(a) other than those contained in subparagraph 2 need only be "considered." A closer look at the §3553(a)(2) factors also reveals that they actually constitute the four traditional "goals of penal sanctions that have been recognized as legitimate - retribution, deterrence, incapacitation, and rehabilitation." *Graham v. Florida*, 560 U.S. 48, 71, 130 S.Ct. 2011, 2028 (2010). The Supreme Court further stated in *Graham*, "A sentence lacking any legitimate penological justification is by its nature disproportionate to the offense." *Id.* The Supreme Court has repeatedly recognized the need for sentences to be justified by these factors of retribution, deterrence, incapacitation, and rehabilitation. "The rationale for capital punishment, as for any punishment, classically rests upon society's need to secure deterrence, incapacitation, retribution, or

11

rehabilitation." *Glossip v. Gross*, __ U.S. __, 135 S.Ct. 2726, 2767 (2015).

And, "The federal and state criminal systems have accorded different

weights at different times to the penological goals of retribution, deterrence,

incapacitation, and rehabilitation." *Harmelin v. Michigan*, 501 U.S. 957, 999,

111 S.Ct. 2680, 2704 (1991)(Justice Kennedy, with whom Justice O'Conner

and Justice Souter join, concurring in part and concurring in the

judgment). Consequently, Jorge will focus on the application of retribution,

deterrence, and incapacitation to his sentence, considering that

rehabilitation cannot support increased incarceration. *Tapia v. United

States*, 564 U.S. 319 (2011).

a.   Deterrence.   Deterrence is both specific and general.   General

deterrence has already largely been accomplished as much as it can

be in this case.   It has been increasingly recognized that it is the

certainty, rather than the severity, of punishment that achieves

deterrence.   In May 2016, the U.S. Department of Justice's National

Institute of Justice published a fact sheet entitled Five Things About

Deterrence, which summarized the research that has been done on

deterrence. (Fact Sheet attached as Exhibit Twelve).  Three of the five

"things" are: 1) The *certainty* of being caught is a vastly more powerful

deterrent than the punishment;  2) Sending an individual convicted

of crime to prison isn't a very effective way of deterring crime; and 3)

Increasing the severity of punishment does little to deter crime. Thus, the arrests in this case have effected general deterrence. And a forty year sentence is more than sufficient to provide specific deterrence, dissuading Jorge from future crime.

b.  Incapacitation.  Figure 2.15 from a U.S. Sentencing Commission study (attached as Exhibit Thirteen) shows that drug trafficking offender re-arrest rates diminish significantly when the offenders reach Jorge's age.  And Figure 2.13 from the same study shows that increasing the length of the sentence does not reduce the re-arrest rate after release.  In short, incapacitation does not support a sentence of longer than 40 years and is not necessary for Jorge in light of Jorge's gainful employment during the period preceding his arrest.

c.  Rehabilitation.  Rehabilitation, of course, cannot be used to justify incarceration. *Tapia v. United States*, 564 U.S. 310 (2011).  That said, upon release from incarceration, Jorge's past employment supports the conclusion that he will resume gainful employment upon release from incarceration.

d.  Retribution.  The final purpose of punishment recognized by the Supreme Court is retribution.  Section 3553(a)(2)(A) reads, "the need for the sentence imposed to reflect the seriousness of the offense, to

promote respect for the law, and to provide just punishment for the offense." But *Farmer* and the other Supreme Court cases cited above make clear that this is actually the sentencing purpose of retribution. As the Supreme Court states in *Farmer*, retribution is a means for society to "express its condemnation of the crime and to seek restoration of the moral imbalance caused by the offense." *Farmer*, 560 U.S. at 71. The Court continues that it is "the heart of the retribution rational that a criminal sentence must be directly related to the personal culpability of the criminal offender." The challenge for this Court is how to apply the concept of retribution to Jorge and how to determine the period of incarceration that retribution supports.

Jorge submits that that determination should be informed by the annual Jefferson Lecture in the Humanities, sponsored by the National Endowment for the Humanities, that was delivered by University of Chicago Law and Philosophy Professor Martha C. Nussbaum in Washington, D.C., on May 1, 2017 (attached as Exhibit Fourteen). Entitled "Powerlessness and the Politics of Blame," the lecture begins by recounting the plot of the ancient Greek play *Oresteia* by Aeschylus, in which the goddess Athena introduces legal institutions into Athens to replace and end the cycle of blood vengeance. In the play blood guilt will now by settled by newly

14

established courts of law rather then by the Furies, the ancient goddesses of revenge. However, the Furies are also transformed, changing from repulsive and horrifying beings who belong in "some barbarian tyranny where cruelty reigns" into the Kindly Ones who have adopted "a new range of sentiments, substituting future-directed benevolence for retribution," and who now "must listen to the voice of persuasion."

This leads into Nussbaum's analysis of contemporary society, where, "when problems are complex and their causes poorly understood,...fear often leads us to pin blame on individuals or groups, conducting witch hunts rather than pausing to figure things out....And fear also feeds the focus on payback, since vulnerable people think that getting back at wrongdoers, even obliterating them, is a way of reestablishing lost control and dignity."

Nussbaum then asks, what is the alternative to revenge?, and turns to Martin Luther King, Jr. She writes that:
King always said that anger had a limited usefulness, in that it brought people to his protest movement, rather than sitting in despair. But once they got there, the anger had to be "purified" and "channelized." What he means is that people must give up the payback wish and yet keep the spirit of justified protest. Instead of

retribution, they need hope, and faith in the possibility of justice.

Nussbaum concludes, "It might seem strange to compare King to Aeschylus," but King is "basically saying the same thing: democracy must give up the empty and destructive thought of payback and move toward a future of legal justice and human well-being....He resists one of the most powerful of human impulses, the retributive impulse, for the sake of the future....Lashing out in anger and fear does not solve the problem; instead it leads, as it did in both Athens and Rome, to a spiral of retributive violence."

So how does Martha Nussbaum's analysis apply to Jorge? The answer is simply that a forty year sentence is more than sufficient to achieve warranted retribution. Any longer sentence would both be excessively punitive, would impair Jorge's re-integration into society, and would unduly penalize his family by keeping him from them longer than necessary. These would all work to society's detriment, as well as to Jorge's. Jorge is the one who has brought a sentence of imprisonment on himself. But it is incumbent upon the Court to not make that sentence longer than necessary. And taking into account all of the factors discussed above, any sentence of more than forty years would be greater than necessary.

**Disparities with Sentences of Other Participants**

22.    The final §3553(a) sentencing factor that Jorge asks the Court to consider
is §3553(a)(6), which states that the Court shall consider "the need to avoid
unwarranted sentence disparities among defendants with similar records
who have been found guilty of similar conduct." The Supreme Court in *Gall
v. United States*, 552 U.S. 38, 128 S.Ct. 586, 599 (2007), stated that the
district court is "required" by this section to consider "unwarranted
sentence disparities."

23.    In its opinion in the direct appeal of this case the Seventh Circuit stated,
"We also wish to clarify that in considering whether there are any
'unwarranted sentence disparities' pursuant to 18 U.S.C. §3553(a)(6), a
district court *may* consider the sentences imposed on cooperating co-
conspirators....But the rule only prohibits sentence disparities that are
*unwarranted.* It is within the district court's discretion to determine
whether the disparity is warranted in light of the co-conspirator's
cooperation."

24.    This Court was uncertain on this point at the time of the original
sentencing. In addition, not all the other defendants had been sentenced
when Jorge was originally sentenced. Now all defendants have been
sentenced, except for Hector Uriarte's re-sentencing.

25.    Defendant Uriarte wants to be clear that he is not asking the Court to

question the government's charging and plea agreement practices in this case. They are the province of the executive branch of government. At the same time, sentencing is the province of the judicial branch of government. In performing its sentencing duties the court is entitled to take into account the sentencing consequences of the charging and plea agreement decisions of the government in so far as they result in disparities in the sentences between defendants who engaged in similar conduct and who have similar records. Indeed, *Gall* requires the Court to do so. Of course, what the court must do is to determine not just whether there are disparities, but whether the disparities are warranted or unwarranted.

26. There is however one aspect of the government charging decision of which the Court should be aware and which it should take into account in imposing sentence. The trial began with jury selection on November 7, 2011. Rec. Doc. #663. The Presentence Report inaccurately states at page 7, line 86 that the trial began on January 3, 2012. The verdict was returned on January 31, 2012. Rec. Doc. #800. On October 18, 2011, three weeks before trial, counsel for the government sent to counsel for Jorge Uriarte a letter stating that if he pleaded guilty to Counts One, Eight, and Thirteen prior to trial, the government would dismiss Count Eleven, the second §924(c) count, at the time of sentencing. With such a plea the mandatory minimum would have been 17 years instead of 42. No

cooperation was required as a condition of the plea. Letter attached as Exhibit Fifteen. Counsel for Jorge has carefully reviewed Fed.R.Crim.P. 11(c)(1) and its Advisory Committee Notes before disclosing this letter. The rule states only that the court must not participate in plea discussions. But, "once the parties have themselves negotiated a plea agreement and presented that agreement to the court for approval, it is not only permitted but expected that the court will take an active role in evaluating the agreement." *United States v. Kraus*, 137 F.3d 447, 452 (7th Cir. 1998). It is "the discussions culminating in the plea" from which the court must remain removed while they are going on. *Id.* at 453. Thus, after judgment has been entered in the case there is no preclusion from the district court being made aware of aspects of the plea negotiations. Such information is the type of information a court is entitled to consider in making determinations under §3553(a).

27.    In this case, in light of the government letter, the twenty-five year consecutive sentence for the second §924(c) conviction is clearly a trial tax. The defendant is not stating that it is unlawful. The Supreme court has accorded the prosecution wide discretion in deciding which charges to bring. Only if actual vindictiveness is shown can that be challenged. *United States v. Goodwin*, 457 U.S. 368 (1982); *Bordenkircher v. Hayes*, 434 U.S. 357 (1978). At this late date in the case the defendant is not raising

vindictiveness.

28.     Nevertheless, the government's letter raises an important consideration for the Court in this re-sentencing.  The Supreme Court has unequivocally stated, specifically with respect to an increased punishment resulting from going to trial instead of pleading guilty, "To punish a person because he has done what the law plainly allows him to do is a due process violation 'of the most basic sort.' ....For while an individual certainly may be penalized for violating the law, he just as certainly may not be punished for exercising a protected statutory or constitutional right."  *Goodwin, supra,* 457 U.S. at 372.  The Seventh Circuit has similarly stated with respect to a choice to go to trial, "Our part in the administration of federal justice requires that we reject the theory that a person may be punished because in good faith he defends himself when charged with a crime, even though his effort proves unsuccessful."  In reversing the sentence and remanding the Court stated, "It is evident that the punishment imposed by the district court on [the defendant] was in part for the fact he availed himself of his right to a trial, and only in part for the crime for which he was indicted." *United States v. Wiley*, 278 F.2d 500, 504 (7th Cir. 1960).  The Second Circuit has likewise stated, "appellants argue that more severe sentences were imposed upon them because they exercised their right to stand trial.  If this is true, the constitutional rights of the appellants have been infringed." *United States*

*v. Capriola*, 537 F.2d 319, 320 (2nd Cir. 1976).

29.   As applied to this case, the court must recognize that the government

concluded that a sentence of 25 fewer years was acceptable, if only the

defendant agreed to not go to trial. Nothing in Jorge's criminal conduct

changed. It has been recognized that some consequence can flow from the

decision to burden the criminal justice system with a trial. Under the

Federal Sentencing Guidelines entry of a plea of guilty prior to the

commencement of trial "will constitute significant evidence of acceptance of

responsibility" and will create eligibility for a two point reduction, as well as

the awarding of a third point reduction for timely notifying authorities of the

defendant's intention to plea guilty. However, the effect of the three points

at play in that guideline provision pale in comparison to the 25 year swing

at issue here. The Supreme Court rulings on prosecutorial discretion are

underlain by separation of powers considerations as well as concerns about

the difficulty of ascertaining prosecutorial motives. But these constraints

do not apply to the district court in imposing sentence. It is incumbent on

this court to determine how much of a trial tax to impose on Jorge Uriarte.

If this Court concludes that 25 years is too much time for a trial tax, then

the Court should reduce the Sentencing Guideline portion of the sentence

by the appropriate amount to produce a just total sentence.

30.   Turning now to application of §3553(a)(6) to this case, in addition to the

requirement under §3553(a)(6) that the Court consider unwarranted disparities, the Seventh Circuit has also recognized specifically with respect to §3553(a)(6), that "a judge need not accept the Sentencing Commission's penological framework. The court may adopt its own....the court is free to adopt its own policy about which differences are 'unwarranted.'" *United States v. Bartlett*, 567 F.3d 901, 909 (7th Cir. 2009).

Because the trial was so long ago, and the charges and sentences are so complex, a complete depiction of the criminal conduct and sentences of the other participants may be helpful and therefore is provided here.

| Trial Defendants | Counts Of Conviction | Sentence |
|---|---|---|
| Glenn Lewellen | Count 13 | 216 months |
| Hector Uriarte | Counts 1,4,5,7,8,10,11,12, & 13 | 216 months on Counts 1,4,5,7,10, 12, & 13; 84 months consecutive on Count 8; & 300 months consecutive on Count 11 = 600 months |
| Jorge Uriarte | Counts 1,7,8,10,11,12, & 13 | 336 months on Counts 1,7,10, 12, & 13; 60 months consecutive on Count 8; & 300 months consecutive on Count 11 = 720 months |
| Manuel Uriarte | Count 1 (guilty plea after hung jury) | Count 1 = 72 months |

| Tony Sparkman | Counts 1,7,8,10,11,12 & 13 | 120 months on Counts 1,7,10,12 & 13; 60 months consecutive on Count 8 (after remand); & 300 months consecutive on Count 11 = 480 months |
| Robert Cardena | Counts 4 & 13 | Counts 4 & 13 = 120 months |
| **Guilty Pleas** | | |
| Saul Rodriguez | Count 1 | 480 months |
| Andres Flores | Count 1 | Count 1 = 175 months |
| Fares Umar | Count 1 | Count 1 = 120 months with credit for 69 months time already served in IDOC |
| Walter Johnson | Count 13 | Count 13 = 158 months |
| Jorge Lopez | Count 13 | Count 13 = 180 months |
| **Immunity** | Crimes | |
| David Vanegas | Kidnapping and drug trafficking | Immunity |
| Lisette Vanegas | Kidnapping and drug trafficking | Immunity |
| Roy Cockriel | Building thousands of drug traps in cars and houses | Immunity |

The following sentences have been imposed on defendants who went to trial:

1. **Glen Lewellen** was sentenced to 216 months on the drug conspiracy count, Count 13. The jury was unable to reach a verdict on the Count One RICO charge and the government did not re-try it. The government asked the Court for

a sentence of 30 years (360 months) in prison. Government's Response to Defendant's Sentencing Memorandum, p.23, Rec. Doc. #1325. The Court imposed a sentence of 216 months. Lewellen Amended J&C, Rec. Doc. #1345.

2. **Hector Uriarte** was convicted of Counts 1,4,5,7,8,10,11,12 and 13, which included one more kidnapping and one more drug count than Jorge Uriarte was convicted of. At sentencing the Court imposed on Hector a three point Sentencing Guideline enhancement for being a manager/supervisor. See, Hector Uriarte Presentence Report, Rec. Doc. 940 and Hector Uriarte Sentencing Transcript, Rec. Doc. 1388. Jorge received no enhancement for his role in the offense. Yet Hector was sentenced to 216 months to run concurrently on Counts 1,4,5,7,10,12, and 13, as compared to Jorge's 336 months on two fewer counts of conviction. They both received 84 and 300 months consecutively on the two firearms counts. Hector Uriarte J&C, Rec. Doc. #1258. The total sentence was 600 months.

3. **Jorge Uriarte** was sentenced to 336 months on Counts 1,7,10,12, and 13, and the same 84 and 300 months as Hector Uriarte and Tony Sparkman on the firearms counts. The total sentence was 720 months.

4. **Manuel Uriarte**. The jury acquitted defendant Manuel Uriarte of Counts Two and Three, which both charged murder in aid of racketeering activity, and was unable to reach a verdict on Count One, the RICO conspiracy charge. The government elected to retry Count One, but before a retrial could take place a plea

24

agreement was reached and a plea entered on Count One. At sentencing the government asked for a sentence of 180 months. Government's Response to Defendant's Objections to Presentence Report and Sentencing Memorandum, p. 9, Rec. Doc. #1322. The Court imposed a sentence of 72 months.

5. **Tony Sparkman** at re-sentencing was sentenced to 120 months concurrently on Counts 1,7,10,12, and 13, to 60 months consecutively on the first firearm count , and 300 months consecutively on the second firearm count. The total sentence after remand is 480 months.

6. **Robert Cardena** was convicted of drug possession and drug conspiracy counts. The government asked the Court for a sentence of 188 months. Government's Response to Defendant Robert Cardena's Sentencing Memorandum, p. 6, Rec. Doc. #1068. The Court imposed a sentence of 120 months.

This case also involved many additional offenders besides those who went to trial. The following individuals had engaged in the conduct set forth below, entered plea agreements, and received the sentences set forth below. Three other individuals received immunity from prosecution.

7. **Saul Rodriguez** is the mastermind of this entire case. He is the moving force behind virtually all of the murders, kidnappings, robberies, and drug trafficking. Rodriguez's plea agreement sets forth criminal acts that he admitted to organizing and participating in. They include three murders, one attempt murder, 14 kidnappings involving 29 victims, the theft of 785 kilograms of

cocaine, and the theft of $2,783,5000. Saul Rodriguez Plea Agreement (Rec. Doc. #534). The plea agreement agrees to a Total Offense Level of 45 and a sentence under Fed. R. Crim. P. 11(c)(1)(C) of not less than 30 or more than 35 years.

After the plea agreement had been entered, the government discovered that while Rodriguez was purporting to cooperate, he smuggled a cell phone into the Chicago Metropolitan Correctional Center and made over 1000 phone calls, the nature of which will never be known with any certainty; he lied to a federal grand jury about the murders of Juan Levano and Michael Garcia; and he accepted a payment of at least $6000 from Vincente Zambada Niebla, son of the co-leader of the entire Sinaloa drug cartel, in exchange for information about the whereabouts of relatives of Pedro Flores and his brother, Margarito Flores (who were expected to be witnesses against Zambada), so Zambada could have the relatives killed to discourage the Flores brothers from testifying. See, Defendant Jorge Uriarte's Objections to Presentence Report and Sentencing Memorandum, pp. 11-12 (Rec.Doc. #930). The government did not dispute the information in this paragraph in its response, Government's Response to Jorge Uriarte's Objections to the PSR & Sentencing Memorandum (Rec. Doc. #31).

Ordinarily, a defendant who commits one felony while under a cooperation agreement will loose his plea agreement entirely. Here, the agreed upon sentence was changed by an Addendum To Plea Agreement (Rec. Doc. # 734) from not less than 30 and more than 35 years to not less than 30 and not more than 40 years.

Rodriguez was sentenced to 40 years.

8. **Andres Flores** admitted in his plea agreement (Rec. Doc. #448, entered Aug. 10, 2011) to violating the RICO conspiracy statute by committing the following offenses: 1. In the summer of 2006, stealing 300 kilograms of cocaine from a house in Joliet, Illinois; 2. The October 20, 2007, kidnapping through a home invasion of the band manager Pedro Avila, his wife, and five children; and 3. The April 9, 2009, attempted possession of 600 kilograms of cocaine in Channahon, Illinois, at which Flores and five others were arrested.

Flores also admitted to the following criminal conduct under a proffer agreement under Sentencing Guideline §1B1.8(a), pursuant to which the conduct is not used to calculate Flores' Sentencing Guideline range: 1. The 2000 murder of Juan Levano, aka Baby G. Saul Rodriguez orchestrated this murder. In his plea agreement Flores admits to shooting Levano. Manuel Uriarte was also charged with this murder, but was acquitted by the jury in the trial in this case. 2. The 2001 murder of Michael Garcia. Saul Rodriguez also orchestrated this murder. In his plea agreement Flores admits to shooting Garcia. Manuel Uriarte was charged with being the get away driver, but was acquitted in the trial in this case. 3. The 2002 kidnapping of bar owner Maria Saldivar, discussed above. 4. The 2005 attempted murder of an unknown victim, identified in this case as Victim X. This was orchestrated by Saul Rodriguez. Flores admitted in his plea agreement to shooting the man, but the man was able to run away and did not

die.  5. In 2005 Flores embarked on a plan to kill the boyfriend of the mother of one of Rodriguez's children.  He was waiting in a location in Berwyn, when he was approached by the police, who believed he was reading pornography in his car, and he was taken to the police station.  He did not take any further steps in this endeavor.  6. The 2006 restraint of three or four men at a Home Deport parking lot who were thought to possess drug proceeds.  The men were restrained, but only $2000 or $3000 was found.  7.  The 2008 kidnaping of Jose Carranza and Esteban LNU in a house in Lyon's Illinois owned by Saul Rodriguez's parents.  8. The 2008/2009 home invasion and attempted robbery of Rafael Montano, his wife and child in Burbank, Illinois.  And, 9. On April 9, 2009, obtaining two firearms that were taken to the Channahon, Illinois, during the attempted cocaine possession.

According to Flores' plea agreement, even excluding the proffer protected conduct, his advisory Sentencing Guidelines offense level is 38 and he is criminal history category III,  resulting in an advisory guideline range of 292 - 365 months. Under his Fed.R.Crim.P. 11(c)(1)(C) plea agreement, Flores agreed to and received a sentence of 175 months.

9.  **Fares Umar** admitted in his plea agreement (Rec. Doc. #585, entered Oct. 21, 2011) to violating the RICO conspiracy statute by committing the following offenses: 1. The 2001 kidnapping and robbery of 80 kilograms of cocaine from two unknown individuals in a stash house in Will County;  2. The 2001

kidnapping of an unidentified individual and the stealing of $1,500,000 in narcotics proceeds from a stash house on South Kenneth in Chicago, Illinois; 3. The 2002 kidnapping of Maria Saldivar, a bar owner whose kidnapping and ransom payment was orchestrated by her own granddaughter and by Saul Rodriguez; 4. The 2003 kidnapping of the drug supplier of a man named Paisa, from whom 20 kilograms of cocaine were stolen; 5. The May 29, 2003, kidnapping of Jimmy Lopez, whose family owned a tire shop and who "paid back" almost $1 million in ransom to Saul Rodriguez; 6. The 2003 kidnapping of drug supplier Pedro Flores, the twin brother for whom a ransom of $500,000 plus 100 kilograms of cocaine was paid; 7. The November 18, 2003 kidnapping of Teodoro Bueno, for which kidnapping Umar was arrested and convicted in state court; 8. The 2004 kidnapping of Giovanni Chimera, Francisco Espinoza, and Kenneth Rivera, drug and money couriers for drug supplier Pedro Flores, which resulted in the theft of 135 kilograms of cocaine; and 9) participation from 2001 to 2009 in the drug conspiracy charged in this case.

According to the plea agreement, Umar's total offense level for this case was 45, with Criminal History Category IV, resulting in an advisory Sentencing Guideline range of life. His plea agreement under Fed.R.Crim.P. 11(c)(1)(C) provides for a sentence of not less than ten and not more than 15 years incarceration, with that time to be reduced by the "actual time served and remaining to be served at the time of sentencing...in connection with Illinois case

03 CR 2675601." That state court sentence was a 12 year sentence with day for day good time for the Teodoro Bueno kidnapping. On May 8, 2013, this Court actually imposed a sentence of ten years with five years nine months credit for time already served on the state sentence. (Umar J&C, Rec. Doc.# 1342). In his trial testimony, Umar stated that he is expecting to actually serve a sentence in this case of only four years. Trial Transcript, p. 1164. When asked if he was happy with his prospective four year federal sentence, Umar stated, "I don't think so...I didn't want to do no time...I mean, I wasn't happy with it. I just took it 'cause I felt I didn't have no choice."

11. **Walter Johnson.** According to his Plea Declaration, Walter Johnson did not cooperate before the trial in this case. According to the Government's Sentencing Memorandum for Mr. Johnson, Johnson "purchased well over 1,000 kilograms of cocaine from the Rodriguez DTO." The government asked for a sentence within the Sentencing Guideline range of 188 to 235 months incarceration. The Court imposed a 158 month sentence. According to a subsequent Government Rule 35 motion, Johnson then cooperated with the government on other cases, resulting in state court prosecutions. See, Government Rule 35 Motion, Rec. Doc. #1580. This Court granted the Rule 35 motion and reduced Johnson's sentence to 95 months.

12. **Jorge Lopez** admitted in his plea agreement (Rec. Doc. #504) to violating the RICO conspiracy statute and to committing the following offenses: 1.

The 2004 kidnapping of Giovanni Chimera, Francisco Espinoza, and Kenneth Rivera, who were drug and money couriers for drug supplier Pedro Flores, which resulted in the theft of 135 kilograms of cocaine;  2. The 2008 kidnaping of Jose Carranza and Esteban LNU in a house in Lyon's Illinois owned by Saul Rodriguez's parents. 3. The April 9, 2009, attempted possession of 600 kilograms of cocaine in Channahon, Illinois, at which Lopez and five others were arrested. 4. The 2001 - 2009 drug conspiracy, pursuant to which Lopez both purchased cocaine from Saul Rodriguez on many occasions in wholesale quantities and delivered drugs in wholesale quantities to Rodriguez on behalf of another drug trafficking organization.  And, 5. In 2001 Lopez hired Saul Rodriguez to murder Michael Garcia, who Lopez thought had struck Lopez's brother Eduardo with a car and killed him.  Lopez paid Rodriguez $15,000.  As set forth above, Andres Flores has admitted to killing Garcia, and Manuel Uriarte was acquitted of the charge that he was involved in that murder.

According to his original plea agreement, Jorge Lopez's advisory sentencing guideline range was level 42 with criminal history category I.  Before the motion under Guideline §5K1.1 his advisory guideline range was 360 to life.  An Addendum to the Plea Agreement was entered under Fed.R.Crim.P. 11(c)(1)(C) (Rec. Doc. #1399) that provided for a term of imprisonment of 180 months, which is what this Court imposed. (Lopez J&C, Rec. Doc. #1410).

Three other persons participated in the crimes in this case and testified at

trial, and were given immunity from prosecution. They are not technically co-defendants, but they are certainly unindicted co-conspirators. The district court was entitled to take their grants of immunity into account under §3553(a). They are David and Lisette Vanegas and Roy Cockriel.

13. **Lisette Vanegas** began working as a drug and money courier in the early 1990s for a drug dealer named Ruben Olaquez. One of the people she delivered drugs to ten to twenty times was Saul Rodriguez. After she served a state court drug sentence in 1998, Lisette Vanegas began delivering drugs and picking up and counting drug money in amounts of up to $200,000 for Saul Rodriguez, all until 2003. She also took money to Las Vegas to place bets for Saul Rodriguez from 1999 to 2009. She also met a Mexican man named Chato around 2000, who she met through Saul Rodriguez. On ten to thirty occasions she counted and packaged drug money for Chato to be sent to Mexico, in amounts, as Vanegas put it, of never more then $5 million in cash at a time. Finally, in approximately 2002, Vanegas agreed with Saul Rodriguez to kidnap Vanegas' own grandmother, Maria Saldivar for ransom. She received some $40,000 from the ransom. Lisette Vanegas also assisted Saul Rodriguez with his monitoring of the kidnapping of Jose Carranza and Esteban LNU in a house in Lyon's Illinois owned by Saul Rodriguez's parents. She further assisted her husband David in the distribution of the cocaine received by Saul Rodriguez as a part of the ransom in the kidnapping of Pedro Flores. She testified that she and David actually stole two

kilograms of the ransom cocaine. Lisette Vanegas' criminal activities are set forth more fully in her trial testimony, pages 547 to 749 of the Trial Transcript.

14. **David Vanegas** met Saul Rodriguez through his wife. In 2000 he torched a car (succeeding on the third try) for Rodriguez. He accompanied Lisette on a trip to San Diego on which they carried $1 million in drug money. The money was seized by law enforcement in Albuquerque, New Mexico, but the Venegases were not arrested. David also took trips to Las Vegas in the early 2000s for Saul Rodriguez to place large bets. Saul Rodriguez was the best man at the Vanegas's wedding and is the godfather of their daughter. In around 2003, David worked for Saul Rodriguez delivering drugs for a few months. In 2003, at the request fo Saul Rodriguez, David was involved with defendant Fares Umar in the purchasing of the Crown Victoria car that resembled an undercover police car and which Saul Rodriguez testified was involved in a number of crimes in this case. Next, David Vanegas participated in the kidnapping of Pedro Flores. He testified that he was involved in the actual kidnapping and that Flores was held at his house. In addition, David was involved in picking up the ransom paid for Flores and in distributing the drug portion, including making three or four trips to Tennessee with parts of it. Another kidnapping that David was involved in was the kidnapping of Teodoro Bueno, described earlier in this memorandum and for which Fare Umar was arrested and convicted in state court. David was not charged. David also testified that in 2003 or 2004 he was involved in a kidnapping at an

automobile auction. David further testified about taking part with Saul Rodriguez and Glenn Lewellen in the robbery of a Mexican man in a house near the Indiana Skyway, for which his portion of the proceeds was $80,000. David Vanegas' criminal activities are set forth in his trial testimony, pages 1229 to 1465 of the Trial Transcript.

15. **Roy Cockriel.** The third person receiving immunity was Roy Cockriel, who built hidden compartments in cars and houses in which drugs and guns could be stored ("traps"). He testified that he was confronted by DEA about his activities on December 15, 2005. They found in his house, but did not seize, approximately $1 million, which he has subsequently spent. In January, 2006, he entered into an immunity agreement with the government. He testified in this case that for the decade before he received immunity he installed thousands of traps for drug dealers around the United States, including several for Saul Rodriguez. The largest number were in the Chicago area. He testified that he made "millions and millions of dollars" during the decade he installed traps. Cockriel's activities are set forth in his trial testimony, pages 1484 to 1546 and 1562 to 1575 of the Trial Transcript.

31. Jorge Uriarte is not asking the Court to impose a sentence that is the same as all the defendants who cooperated. Some reduction in the sentence of a defendant who chooses to cooperate is a warranted disparity. But in this case the differences in the sentences are massive and they are not justifiable or warranted in the law.

32. Other courts have recognized the need to do what is being advocated here. The Eleventh Circuit affirmed a sentence that the government had appealed in which the leader of an organization who cooperated received a 188 month sentence, and his brother, who played a lesser role and pleaded guilty but did not cooperate, received a substantial downward variance to 180 months. The appellate court stated with approval, "In considering Zavala's sentence, the district court stated its belief that 'the imposition of a greater sentence than 178, 180 months, would cause the public to question the justice of a system that imposes a greater sentence on a follower than a leader.'" *United States v. Zavala*, 300 Fed.Appx. 792, 795, 2008 WL 4997052 (11th Cir. 2008).

33. Similarly, in a child exploitation case, the 10th Circuit approved a sentence over a government appeal. Noting that "*Gall* allows district courts to consider disparities between codefendants," the appellate court quoted with approval the district courts determination that: "I feel it would violate [18 U.S.C. §3553]...if you receive a far greater sentence than Mr. Rousey....As I stated, he was obviously the instigator and the promoter of this whole event and got others involved..." *United States v. Smart*, 518 F.3d 800, 809-810 (10th Cir. 2008).

34. In this case, a sentence of more than 40 years for Jorge Uriarte would create an egregious and wholly unwarranted disparity between Jorge and: 1) Manuel Uriarte (6 years); 2) Tony Sparkman (convicted of virtually the same

counts, 40 years); 3) Andrea Flores (convicted of the RICO conspiracy, plus multiple murders - the fact they became known via a proffer does not alter their significance for determining for sentencing purposes what is fair, by comparison, for Jorge); 4) Fares Umar (120 months minus 69 months already served in state custody, for engaging in conduct almost identical to that of Jorge); 5) Jorge Lopez (15 years, for engaging in at least two kidnappings, multiple drug trafficking deals with Saul Rodriguez, including the April 9, 2009 sting operation for 600 kilograms, and for hiring Saul Rodriguez to kill Michael Garcia in 2001, which Andres Flores actually carried out; and 6) Lisette Vanegas, David Vanegas, and Roy Cockriel (the Vanegas's were each involved with Saul Rodriguez in at least three kidnappings and multiple drug transactions, and Cockriel made "millions and millions of dollars building traps to conceal drugs and guns, many for Saul Rodriguez, and all of whom received immunity from prosecution, meaning, of course, no sentence); and 7) Saul Rodriguez. Saul Rodriguez is one of the most evil and dangerous individuals to be ever prosecuted in the Northern District of Illinois. He is extremely smart and completely without a moral compass. In short, he is capable of violating every norm and value of civilized society. The jury figured out that he could not be believed and convicted no one based solely on his testimony. And he committed three federal felonies while preparing to testify the government. His sentence was

36

forty years.  There is absolutely no principled basis on which a sentence for Jorge Uriarte should be greater than that of Saul Rodriguez.  Similarly, the shortness of the sentences of the other defendants described above also support a sentence of no more than 40 years for Jorge.

35.  Finally, the §3553(a)(2) factors, as discussed above, are actually the legitimate purposes of punishment, namely: deterrence, incapacitation, rehabilitation, and, properly understood, retribution.  They also support a 40 year sentence.  With the additional information about Jorge Uriarte set forth at the beginning of this memorandum, the court should conclude: 1) that deterrence has been achieved as much as it can be; 2) that forty years is more than sufficient incapacitation.  This whole case was organized and executed by Saul Rodriguez, on occasion with help from Lewellen.  Jorge was not capable of and did not play any organizing role.  He was, in fact, putting together a life as a carpenter and family man through which he could escape from Rodriguez.  And Jorge's brother Hector was not only convicted of more counts, but was more involved organizationally, as is evident from his guideline leadership enhancement and from the picture in evidence of Hector and Saul Rodriguez together in Las Vegas.  In sum, there is no need and no principled basis, under §3553(a)(2) or the sentencing precepts of deterrence, incapacitation, rehabilitation, and, retribution to re-sentence Jorge Uriarte to more than 40 years in prison.

36.     Finally, there is no need for Jorge to unnecessarily contribute to the mass
incarceration in the United States. On March 13, 2014, in testimony before
the United States Sentencing Commission, Attorney General Eric Holder
stated,

> certain types of cases result in too many Americans going to prison for
> too long, and at times for no truly good public safety reason. Although
> the United States comprises just five percent of the world's population,
> we incarcerate almost a quarter of the world's prisoners. One in 28
> American children currently has a parent behind bars....This focused
> reliance on incarceration is not just financially unsustainable – it
> comes with human and moral costs that are impossible to calculate.

Jorge's excessive incarceration would not serve a "good public safety reason,"
it would impede his rehabilitation, and would unnecessarily keep him away
from his family.

WHEREFORE, defendant Jorge Uriarte asks this Court to impose the 40 year
mandatory minimum sentence as the sentence of incarceration in this case.

                                            Respectfully submitted,

                                            ___S/ John M. Beal_____
                                            Attorney for Defendant

John M. Beal
Attorney at Law
53 W Jackson Blvd., Suite 1615
Chicago, IL 60604
(312) 408-2766